### Ed. Jordon v. The State.

#### No. 3455.　Decided June 5, 1907.

**Unlawfully Issuing Checks—Constitutional Law—Police Regulation—Interference With Private Contract.**

The Act of the Twenty-ninth Legislature, section 1, page 372, which provides that it shall be unlawful for any person, firm, association of persons, corporation, or agent of either to issue any tickets, checks or writing obligatory to any servant or employee for labor performed. redeemable or payable in goods or merchandise, and section 2 of said act providing the punishment, are unconstitutional and void; the same being an unwarrantable interference with the right of private contract, and not within the scope of the police power of the State.

Appeal from the County Court of Palo Pinto. Tried below before the Hon. E. B. Richie.

Appeal from a conviction of unlawfully issuing checks for merchandise; penalty, a fine of $5.

No brief on file for appellant.

*F. J. McCord,* Assistant Attorney-General, for the State.

DAVIDSON, Presiding Judge.—Act of the Twenty-Ninth Legislature, section 1, page 372, reads as follows: "That it shall be unlawful for any person, firm, association of persons, corporations, or agent of either, to issue any ticket, check or writing obligatory to any servant or employee for labor performed, redeemable or payable in goods or merchandise." Section 2 of this act provides the punishment. Appellant was convicted of violating the section quoted, under the following statement of facts: He was the agent of the Strawn Coal Mining Company, located in Palo Pinto County, and for it and in its behalf sold to D. M. Clark a piece of metal having inscribed on one side the following: "Good for $1 in merchandise," and on the reverse side, "Strawn Coal Mining Co., Strawn, Texas." That this piece of metal was redeemable in merchandise at the general store of said company by the person to whom it was originally sold, or to any holder into whose hands it might subsequently come; that its redemption power for the purpose of obtaining merchandise was equal to the purchasing power of $1 of current money of the United States; that is, the holder presenting this piece of metal to the company's general merchandise store could acquire for it in redemption merchandise of equal value as though he presented $1 of current money; the company redeemed the metal with merchandise at current prices, and those prevailing in the vicinity, and charged no more for such redemptions than it did to persons purchasing and paying in current money. That at the time of the

sale of said piece of metal it was charged to the account of the purchaser on the store books of the company, and at the next succeeding pay day was deducted from his pay; that the company had no contract with its men or with the purchaser of the redemption piece to pay him or its men for their labor in such redemption pieces; that frequently it sold these redemption pieces before the respective employee had performed any labor and before anything was due him, but more frequently after some labor had been performed; that the sale and purchase of the redemption pieces is a matter of convenience both to the employees of the company and to the company itself in the transaction of its business. The purchase of the redemption piece on the part of the person purchasing was entirely optional; the company sells such redemption pieces only to such employees as apply for them; no coercion of any kind was used by the company or any of its agents to induce or require the purchaser to buy, nor does it or any of its agents ever use any coercion of any character or kind to induce its employees to purchase redemption pieces. The company pays its employees on the first and third Saturdays of each month, at which time its employees are paid for labor in current money in full, up to within fifteen days of each pay day; these redemption pieces are only sold by the company to its employees, and in this instance was sold between pay days after some labor had been performed; that the company redeemed these redemption pieces, and the one sold to the party herein described, by giving merchandise for the same of the current market and ordinary value of $1; that the redemption piece is simply a form of credit extended by the company to the purchaser, and any employee so purchasing from the company can obtain credit at the company's store between pay days, provided only the employee desired and applied for the purchase of the redemption piece.

Several reasons are urged why the pleading does not show any offense, and that the law under which the pleading is drawn is unconstitutional, in that it violates article 1, section 19 of the State Constitution, besides two clauses of the Federal Constitution, and that it interferes with the right of free contract between the citizens of this State in relation to their private matters. We are of opinion that these contentions are correct. The statute, as framed, is certainly violative of the right of the laborer to make contracts with his employer or to sell his labor for any consideration satisfactory to himself, or for the payment of his labor in any commodity suitable to himself. If this law can stand at all, it must be under the broad provisions of what is commonly understood and denominated police regulation or police power of the State. This is not very clear, and perhaps the question may be involved in mists as to what police power means or where its boundaries may terminate. It has been said that police power is limited to enactments having reference to the comfort, safety, or the welfare of society, and usually it applies to the exigencies involving the public health, safety or morals, but as broad as it may

be, and as comprehensive as some legislation has sought to make it, still it is subsidiary and subordinate to the Constitution. When the purpose of police regulation is to subserve the public in some of these respects, the legislative enactment should ordinarily be sustained, and legislative control is supreme provided always it keeps within the limitations of the constitutional provisions. An inspection of the law, under which this conviction occurred, will show that it is indeed comprehensive and deprives every citizen, firm, association or persons, corporation or agent of either from issuing any ticket, check or writing obligatory to any servant or employee for labor performed, redeemable or payable in goods or merchandise. Under this law no citizen of the State, having another in his employment, could give an order or a check or any character of writing to another to pay off the holder of the check or writing in any character of goods or merchandise. Under this law the farmer could not pay off his employee or hired hand at the end of the day, week or month by giving him an order or a check or any paper in writing calling for payment in goods or merchandise. In other words, this law would prevent the employer and employee from entering into any contract by which the labor performed or to be performed by the employee could be discharged or paid off in merchandise at the hands of another. That this is violative of every fundamental principle of the right of contract will hardly need more than the mere statement of the proposition. Police power or police regulation cannot be upheld to the extent that it will prevent the citizenship of this country making such contracts as they see proper so long at least as the law ignores coercion, or some of those matters that might enter into and prevent a free and untrammeled contract. If the contracting parties prefer to pay off and receive in pay for labor any goods or merchandise, or any commodity that is suitable to the contracting parties, it would be beyond the police power to prevent such contract. We are dealing only with the law as enacted; nor are we alluding to or undertaking to discuss any law that was intended for the benefit of the weaker and against the strong, or any legislation to prevent coercion on the part of either of the contracting parties. Those questions are not involved in this law, for by its very terms it was enacted to prevent any contract from being entered into between the parties where the pay was to be in goods or merchandise. This law is not a sanitary measure, nor is it enacted to protect infants and insane people, but it is only intended to prevent the laborer from selling his labor or time either or both to his employer for goods or merchandise. So far as this statute is concerned, he may sell his time or labor for any other consideration than goods or merchandise. As we understand the question, labor is property, and the laborer has the same right to sell his labor and make contracts with reference thereto as he would any other property he had. The Legislature has no authority to prevent the citizenship of this country from making their own contracts, nor to interfere with the freedom of contract between workman and

employer. As was said in the case of Lochner v. New York, 198 U. S., 45: "The right to purchase or sell labor is part of the liberty protected by this amendment, unless there are circumstances which exclude the right. There are, however, certain powers existing in the sovereignty of each State in the Union somewhat vaguely termed police powers, the exact description and limitation of which have not been attempted by the courts. These relate to the safety, health, morals and general welfare of the public. When the State has passed an act which limits the right to labor, or the right of contract in regard to their means of livelihood between persons who are sui juris, both employer and employee, it becomes of great importance to determine which shall prevail, the right of the individual to labor, or the right of the State to prevent the individual from laboring or from entering into any contract to labor." It is further said in that case, "If the statute be valid, and if, therefore, a proper case is made out in which to deny the right of an individual sui juris as employer or employee to make contracts for the labor of the latter under the protection of the provision of the Federal Constitution, there would seem to be no length to which legislation of this character might not go," and it is further stated, "This interference on the part of the Legislatures of the several States with the ordinary trades and occupations of the people seems to be on the increase." Again, in the case of Kellyville Coal Co. v. Harrier, 69 N. E. Rep., 927, it is said, "It is not within the power of the Legislature to provide that one who is possessed of property may not sell it to another, and agree with the purchaser to work for him in payment for it. The privilege of contracting is both a liberty and a property right. The laborer has a right to contract with respect to his labor, and to make such terms and agreements as may be mutually agreeable to him and his employer. They may agree that the labor of one shall be paid for with the property of the other, or the laborer may agree to work in payment of a pre-existing debt, and in either case the rights of the parties are free from interference from the Legislature." Again, in the case of State v. Fire Creek Coal Co., 10 S. E. Rep., 288, the court said: "The property which every man has in his own labor, as it is the original foundation of all other property, so is it the most sacred and inviolable. The patrimony of the poor man lies in the strength and dexterity of his own hands and to hinder him from employing these in what manner he may think proper, without injury to his neighbor, is a plain violation of this most sacred property. It is equally an encroachment both upon the just liberty and rights of the workman and his employer, or those who might be disposed to employ him, for the Legislature to interfere with the freedom of contract between them, as such interference hinders the one from working at what he thinks proper, and at the same time prevents the other from employing whom he chooses. A person living under the protection of this government has the right to adopt and follow any lawful industrial pur-

suit, not injurious to the community, which he may see fit; and, as incident to this, has the right to labor or employ labor, make contracts in respect thereto upon such terms as may be agreed upon by the parties, to enforce all lawful contracts, to sue and give evidence and to inherit, purchase, lease, sell, or convey property of every kind. The enjoyment or deprivation of these rights and privileges constitutes the essential distinction between freedom and slavery, between liberty and oppression." In the case of Commonwealth v. Perry, 28 N. E. Rep., 1126, this case was decided by the Supreme Court of Massachusetts, and among other things, it was said: "There are certain fundamental rights of every citizen which are recognized in the organic law of all our free American States. A statute which violates any of these rights is unconstitutional and void, even though the enactment of it is not expressly forbidden. The right to acquire, possess and protect property includes the right to make reasonable contracts, which shall be under the protection of the law." In Frorer v. People, 31 N. E. Rep., 398, the court said: "The police power is limited to enactments having reference to the comfort, the safety, or the welfare of society, and under guise of it, a person cannot be deprived of a constitutional right. It is impossible that under that power what is lawful if done by A, if done by B can be a misdemeanor. Theoretically, there is no inferior class, other than that of those degraded by crime or other vicious indulgence of the passions among our citizens. Those who are entitled to exercise the elective franchise ar deemed equals before the law, and it is not admissible to arbitrarily brand by the statute one class of them without reference to and wholly irrespective of their actual good or bad behavior, as too unscrupulous, and the other class as too imbecile or timid and weak to exercise that freedom in contracting which is allowed to all others." Again, in the case of State v. Loomis, 22 S. W. Rep., 350, Chief Justice Black of the Supreme Court of Missouri said: "They single out those persons who are engaged in carrying on the products of mining and manufacture, and say, you cannot contract for labor payable alone in goods, wares, and merchandise, though of full age and competent to contract, still you shall not have the power to sell your labor for meat and clothing alone as others may. It will not do to say that these sections simply regulate payment of wages, for that is not their purpose. They undertake to deny to the persons engaged in the two designated pursuits the right to make and enforce the most ordinary every day contracts, a right accorded to all other persons based upon a classification which is purely arbitrary because the ground of the classification has no relation whatever to the natural capacity of the persons to contract. Liberty, as we have seen, includes the right to contract as others may, and to take that right away from a class of persons following lawful pursuits, is simply depriving such persons of a time-honored right which the Constitution undertakes to secure to every citizen. Applying the principle of constitutional law before stated, we can come to no other con-

clusion than this, that these sections of the statute are utterly void. They attempt to strike down one of the fundamental principles of constitutional government. If they can stand, it is difficult to see an end to such legislaton, and the government becomes one of special privilege instead of a compact to promote the general welfare of the people. We place our conclusion on the broad ground that these sections of the statute are not due process of law within the meaning of the Constitution."

Again, in the case of Godcharles v. Wigeman, 6 Atlantic Rep., 354, it was said: "The orders constitute a proper set-off. The first, second, third, and fourth sections of the act of June 29, 1881, are utterly unconstitutional and void inasmuch as by them an attempt has been made by the Legislature to do what in this country cannot be done; that is, prevent persons who are sui juris from making their own contracts. The act is an infringement alike of the rights of the employer and the employee. More than this, it is an insulting attempt to put the laborer under a legislative tutelage which is not only degrading to his manhood, but subversive of his rights as a citizen of the United States. He may sell his labor for what he thinks best, either money or goods, just as his employer may sell his iron or coal, and any and every law that proposes to prevent him from so doing is an infringement of his constitutional privileges and consequently vicious and void."

In Low v. Rees Printing Co., 59 N. W. Rep., 362, the constitutionality of one of the legislative acts of Nebraska was passed upon, which, in effect, provided that all classes of mechanics, servants and laborers, except those engaged in farm or domestic labor, a day's work should not exceed eight hours. The court denied the constitutionality of the act upon two grounds: First, because the discrimination against farm and domestic laborers was special legislation; second, because by said act the constitutional right of parties to contract with reference to services was denied. That opinion is a very exhaustive one on the questions involved. Among other things, it says: "Property in its broader sense, is not the physical thing which may be the subject of ownership, but is the right of dominion, possession and power of disposition which may be acquired over it; and the right of property preserved by the Constitution is the right, not only to possess and enjoy it, but to acquire it in any lawful mode, or by following any lawful industrial pursuit which the citizen, in the exercise of the liberty guaranteed, may choose to adopt. Labor is the primary foundation of all wealth. The property which each one has in his own labor is the common heritage. And, as an incident to the right of acquiring property, the liberty to enter into contracts by which labor may be employed in such way as to the laborer may seem most beneficial, and of others to employ such labor, is necessarily included in the constitutional guaranty. The legislation attempted cannot be defended as a police regulation, as was attempted in argument, for under pretense of the exercise of that power the Legislature cannot prohibit harmless acts which do not con-

cern the health, safety, and welfare of society. The claim that this act was a proper exercise by the Legislature of its police powers cannot be sustained."

Again, in the case of State v. Haun, 59 Pac. Rep., 341, among other things, the court said: "Under the penal provisions of the statute in question, a laborer who works for a corporation or trust employing ten or more persons is deprived of his freedom of contract, in that he cannot bargain to receive anything in payment for his labor but lawful money of the United States. While it might be desirable and profitable to the employee of such corporation to receive a horse, or a cow, or a house and lot, in payment for his wages, yet the Legislature prohibits payment in that way and places the laborer under guardianship, classifying him, in respect to freedom of contract, with the idiot, the lunatic or the felon in the penitentiary. It has been sought by some judges to justify legislation of this kind upon the theory that, in the exercise of police power, a limitation necessary for the protection of one class of persons against the persecution of another class may be placed upon freedom of contract. As between persons sui juris, what right has the Legislature to assume that one class has the need of protection against another? In this country the employee to-day may be the employer next year, and laws treating employees as subjects for such protective legislation belittle their intelligence, and reflect upon their standing as free citizens. It is our boast that no class distinctions exist in this country. An interference by the Legislature with the freedom of the citizen in making contracts, denying to a part of the people, possessing sound minds and memory, the right to bargain concerning the equivalent they may desire to receive as compensation for their labor, is to create, or carve out a class from a body of the people, and place that class within the pale of protective laws which invidiously distinguish them from other free citizens; thus dividing by arbitrary fiat equally free and intelligent people into distinctive classes or grades, the one marked by law as the object of legislative solicitude, and the other not. * * * To say that a free citizen can contract for or agree to receive in return for his labor one kind of property only, and that which represents the smallest part of the aggregate wealth of the country is a clear restriction of the right to bargain and trade, a suppression of individual effort, a denial of inalienable rights. In Tied. Lim., section 178, the author says: 'Laws, therefore, which are designed to regulate the terms of hiring in strictly private employments, are unconstitutional, because they operate as an interference with one's natural liberty, in a case in which there is no trespass upon private right, and no threatening injury to the public. And this conclusion not only applies to laws regulating the rate of wages of private workmen, but also any other law whose object is to regulate any of the terms of hiring, such as the number of hours of labor per day, which the employer may demand. There can be no constitutional interference

by the State in the private relation of master and servant except for the purpose of preventing frauds and trespasses.'"

To the same effect is the Republic Steel Co. v. State, 66 N. E. Rep., 1005. It would seem useless to pursue this subject further, but we call special attention to the case of State v. Missouri Tie Co., 80 S W. Rep., 933. Such seems to be the almost universal holdings of the court with reference to the questions involved. There is one case of Peel Splint Coal Co. v. State, 15 S. E. Rep., 100, referred to as authority upon the other side of the proposition. We do not care to review that case. There were some peculiar provisions of the law in West Virginia that led to that decision, which is in direct contravention, as we understand from other cases cited, by the same court; but with reference to the Peel Splint Coal Co., supra, we would say that the Supreme Court of that State is composed of four members, and where they are equally divided upon the question, the opinion of the Presiding Judge or Chief Justice of the court becomes the law of the case, and in that particular case the court was divided two and two, and the Presiding Chief Justice of the court became the controlling factor in the decision; but as we understand that case it is antagonistic to all the other cases cited, and is directly antagonistic to the cases decided by the same court when they were not so divided. Viewing the matter as we do, and in the light of the authorities, the principle of our constitutional provisions, the principles of equal rights and freedom of contract, we cannot agree that this act of the Legislature is constitutional; but that the Legislature has transgressed the rights of the people of this country in their private employments to make their own contracts and receive any pay for their labor or in discharge of those contracts such property as they deem proper. whether it be goods or merchandise, stock, lands or houses, or money. Of course, this statute only relates to private and not to public employment, and we are not discussing the questions of frauds and trespasses, for they do not come within the provisions of this law. Force, and fraud and trespass, and intimidation or compulsions on the part of employer against employee are not within the contemplation of the terms of this statute. In support of the correctness of our conclusion, we cite State v. Missouri Tie Co., 80 S. W. Rep., 933; Godcharles v. Wigeman, 113 Pa. State, 431; Frorer v. People, 31 N. E. Rep., 398; Republic Iron and Steel Co. v. State, 66 N. E. Rep., 1005; Lochner v. New York, 198 U. S., 45; State v. Haun, 61 Kan., 146; Commonwealth v. Perry, 156 Mass. 117; Eden v. People, 43 N. E. Rep., 1108; Ritchie v. People, 40 N. E. Rep., 454; State v. Loomis, 22 S. W. Rep., 350; Low v. Rees Printing Co., 59 N. W. Rep., 362; San Antonio & A. P. Co. v. Wilson, 19 S. W. Rep., 911; Lawton v. Steele, 152 U. S., 133; Baltimore & O. Ry. Co. v. Vogt, 176 U. S., 505; Braceville v. People, 35 N. E. Rep., 62; Coffeyville Brick Co. v. Perry, 76 Pac., 848; Budd v. New York, 143 U. S., 517; Cooley Const. Lim., secs. 263, 560, 561, 7th ed.; In re Hutchinson, 137 Fed., 949; Leach v. Missouri Tie & Timber Co., 86 S. W. Rep.,

579; People v. Coler, 166 N. Y., 1; Millett v. People, 117 Ill., 294; People v. Gillson, 109 N. Y., 389; State v. Goodwill, 33 W. Va. 179; State v. Coal & Coke Co., 33 W. Va., 188; Avent Beattyville Coal Co. v. Commonwealth, 96 Ky., 218; Ritchie v. People, 155 Ill., 98; In re Jacobs, 98 N. Y., 98; San Antonio & A. P. Co. v. Wilson, 19 S. W. Rep., 910; Leep v. St. Louis, I. M. Ry. Co., 58 Ark., 407; People v. Zimmerman, 92 N. Y. S., 497; State v. Robbins, 71 Ohio State, 273; Montague v. Furness, 145 Cal., 205; Street v. Varney, 160 Ind., 338; and State v. Fire Creek Coal Co., 10 S. E. Rep., 288. We are, therefore, of opinion that the law under discussion is violative of the provisions of our Constitution; that it infringes upon the right of citizenship of this country in their private matters to make contracts payable or dischargeable in such manner as they see proper and satisfactory, and that it is an unwarrantable and unconstitutional interference with the right of contract. We, therefore, hold the act unconstitutional and void, and the judgment is reversed and the prosecution is ordered dismissed.

*Reversed and dismissed.*